## CONTINUATION IN SUPPORT OF APPLICATION FOR
## SEARCH WARRANT

I, Andrew Holt, being duly sworn, depose and state the following:

## I.     INTRODUCTION

1.      I make this continuation as part of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—specifically a cellular telephone, as described in Attachment A—that is currently in the possession of law enforcement, and the extraction of electronically stored information from that property as described in Attachment B.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") have been so employed since March 2007.  Upon being hired by ATF, I completed twelve weeks of Criminal Investigative Training and fourteen weeks of Special Agent Basic Training.  My responsibilities include the investigation of criminal violations of Titles 18 and 21 of the United States Code.  I am currently assigned to the ATF Field Office in Grand Rapids, Michigan.

3.      I have experience in the investigation, apprehension, and prosecution of individuals involved in federal criminal offenses, including the illegal possession of firearms and the illegal distribution of controlled substances, the use of cellular devices to commit those offenses, and the available technology that can be used by law enforcement to assist in identifying the users of cellular devices and their location.

4.      Throughout my career, I have participated in numerous investigations involving violations of federal firearms laws.  Additionally, I have been the affiant for many federal search warrants and have assisted other state and local agencies, as well as Assistant United States Attorneys, in the preparation of affidavits for search warrants.  I have directed and participated

in the execution of many search warrants relative to investigations of Title 18 and Title 21 of the United States Code. Evidence seized pursuant to these search warrants includes, but is not limited to, firearms, ammunition, controlled substances, drug proceeds, cellular telephones, computers, documents, and records pertaining to the manufacture, possession, and distribution of controlled substances, and proceeds derived from the sale of controlled substances. Further, I have conducted and participated in several firearms investigations that have involved the illegal possession of firearms and the trafficking of those firearms utilizing cellular telephones to communicate about illegal firearms transactions and related activities.

5.     The facts in this affidavit come from my personal observations, training, experience, and information obtained from other agents, officers, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

6.     I respectfully submit that there is probable cause to believe that ZEBULON TIMOTHY NESTER possessed firearms in violation of 18 U.S.C. § 922(g)(1), as well as silencers and Glock switches in violation of 26 U.S.C. § 5861(d). I further submit that there is probable cause to believe that evidence of these offenses will be found on the cell phone described in Attachment A.

## II.     IDENTIFICATION OF DEVICE TO BE EXAMINED

7.     The property to be searched is a **Blu Model View 3,** hereinafter the **"Target Cellular Device."** The **Target Cellular Device** is currently located at the ATF Grand Rapids Field Office in Grand Rapids, Michigan. The **Target Cellular Device** is stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as it was when it was first seized.

8.     The applied-for warrant would authorize the forensic examination of the **Target Cellular Device** for the purpose of identifying electronically stored data, further described in Attachment B.

## III.    PROBABLE CAUSE

9.     In 2014, a jury in Kent County, Michigan convicted Zebulon Timothy NESTER of felony assault with intent to rob while unarmed.  In April 2014, he was sentenced to a minimum of five years and six months in prison.  NESTER was discharged from the Michigan Department of Corrections (MDOC) parole on January 26, 2022.  MDOC parole records reflect that NESTER's address is 3696 Blackmer Road, Ravenna, Michigan.

10.     NESTER served more than one year in prison, and thus was aware he had been convicted of a felony punishable by more than a year.

11.     Beginning in May 2022, the ATF was provided information from Confidential Informant (CI) #27720[1], who stated s/he knew information about firearms for sale.  CI #27720 provided ATF with the following information:

    a.  Zebulon NESTER told CI #27720 that he has "Glock switches" for sale.  From my training and experience, I am aware that a Glock conversion device, commonly referred to as a "Glock switch," is a part, or combination of parts, designed and intended for use in converting a semiautomatic Glock pistol into a fully automatic weapon; therefore, a "Glock switch" is a machinegun under the National Firearms Act, 26 U.S.C. § 5845(a).

---

[1] CI #27720 is cooperating with law enforcement because s/he receives monetary compensation for information.  CI #27720 has the following criminal history: two misdemeanor weapons offenses and felony possession of a controlled substance.

b. NESTER also told CI #27720 that he has firearms he is willing to sell, including a .357 revolver and a .30-06 rifle.

c. In June 2022, NESTER communicated with the CI by Snapchat[2] and in person about illegal firearms. NESTER communicated with the CI under NESTER's Snapchat account name "BadGuy Pluto." I have reviewed screen-capture videos taken by the CI showing various communications that the CI had with NESTER on Snapchat. In messages, NESTER offered to sell the CI several different firearms. Below is a screenshot taken from a conversation where NESTER attempted to sell the CI a .357 revolver and a .30-06 rifle:



NESTER also sent the CI pictures of firearms and videos showing someone's hands possessing firearms and Glock switches, and firing a firearm.

---

[2] As discussed in more detail below, Snapchat is a multimedia communication application that is used on a smartphone or other internet-enabled device. It allows users to send messages, photographs, or videos to other users.

d.   NESTER also showed the CI (in person) a Glock pistol he carries with him. NESTER told the CI that he has additional firearms and silencers at his house. NESTER told the CI that his address is 3696 Blackmer Road in Ravenna, Michigan.

e.   CI #27720 has provided credible and reliable information that has led to controlled purchases of 18 illegal firearms from 9 different suspects under the direction and control of ATF agents.  S/he has also provided information about criminal activity that ATF has been able to corroborate.

12.   On June 22, 2022, under ATF direction, CI #27720 met with NESTER at 3696 Blackmer Road.  The CI covertly video recorded NESTER.  The video shows NESTER in possession of firearms and ammunition.  Specifically, the CI witnessed NESTER in possession of a Glock pistol, AR-15 style rifles, silencers, ammunition, and suspected machine guns.  The CI witnessed NESTER shooting firearms and demonstrating how firearm silencers work.

13.   On June 27, 2022, the Honorable U.S. Magistrate Judge Sally J. Berens issued a federal search warrant (Case No. 1:22-mj-290) for 3696 Blackmer Road in Ravenna, Michigan.

14.   On July 1, 2022, the Bureau of Alcohol, Tobacco, Firearms, and Explosives executed the federal search warrant at 3696 Blackmer Road.  At the residence, agents encountered Rebecca Kid (Zebulon NESTER's wife), Zebulon NESTER, Aaron Capizzi, and two young children.  As a result of the search warrant, agents seized the following items:

a.   nine firearms located in the garage;

b.   three suspected silencers located in the garage;

c.   six firearms located in the residence;

d.   three suspected Glock switches located in the residence and a nearby 3-D printer (which agents suspect created the Glock switches);

e.  miscellaneous rounds of ammunition; and

f.  a **Blu Model View 3** cellular phone **(Target Cellular Device)** plugged in on the left side of the bed in the master bedroom next to Zebulon NESTER'S wallet and identification.  Rebecca Kidd told agents that she shares the primary bedroom with NESTER and identified her phones.  The phones Kidd identified as her own were not the **Target Cellular Device**.

15.  One of the firearms recovered during the search was a Ruger Model 10-22, .22 caliber rifle.  An ATF Special Agent who is trained in the determination of firearms travelling through interstate commerce determined the Ruger Model 10-22, .22 caliber rifle was manufactured and/or distributed from outside the State of Michigan.  Therefore, the firearm traveled through interstate commerce prior to NESTER's possession of it.

16.  Based on my training and experience, participation in numerous firearm investigations and financial investigations relating to illegal firearms, and based upon discussions with other law enforcement officers, I know:

a.  Illegal firearms users and traffickers use mobile telephones to facilitate the purchase and sale of illegal firearms.  Mobile phones are portable, and some mobile telecommunications service providers do not require purchasers of the devices to provide their names and/or addresses, so firearms traffickers use the devices in an effort to avoid detection by law enforcement.  People often carry their cellular phones with them at all times.  Mobile phones often contain evidence indicative of illegal firearms possession and trafficking, including records of incoming and outgoing calls and text messages with suppliers and purchasers of firearms; voicemail messages; photographs of firearms, coconspirators, or currency;

customer and supplier contact information; and, in the case of "smart phones," Global Positioning System (GPS) data indicating the location of the device at given points in time, providing evidence that the device was in high crime areas or evidencing the route used in trafficking illegal firearms.  Further, these types of devices are used to access social media websites such as Snapchat.  In my training and experience, I know that illegal firearms possessors and traffickers use social media assessed via cell phones with increasing frequency to communicate with suppliers and purchasers.

b.  It is common for illegal firearms possessors to take and maintain photographs of themselves and their colleagues with firearms and cash displayed as the tools and proceeds of their illegal activity, and to keep either physical or electronic copies of those images.  The images are often stored on smart phones, computers, and other digital devices, as well as on social media websites such as Snapchat, Facebook, Instagram, etc., and accessed via computers and cell phones.  Digital evidence can be found for a long period of time on computers, cell phones, and other devices because a forensic examiner can access even temporary and deleted files, as well as internet history, long after they are accessed or created by the user.

c.  Cellular phones also generate internet use history that can reveal the websites or internet queries entered by the person using the device, including searching for the addresses of various businesses or other locations.

d.  Further, cellular phones and similar devices are frequently used to access social media websites such as Snapchat.   In my training and experience, firearms

traffickers are using social media with increasing frequency to communicate with suppliers and purchasers of firearms.

e. I am also aware that individuals who possess firearms also possess other items associated with their firearms including ammunition, magazines, holsters, cases and records indicating purchase, use, maintenance or sale of such items.

## IV. ELECTRONIC STORAGE AND FORENSIC ANALYSIS

17. The warrant applied for would authorize the extraction and copying of electronically stored information, all under Rule 41(e)(2)(B).

18. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

19. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Target Cellular Device** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

8

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

20.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Target Cellular Device** consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **Target Cellular Device** to human inspection in order to determine whether it is evidence described by the warrant.

21.  *Manner of execution.*  Because this warrant seeks only permission to examine the **Target Cellular Device** already in law enforcement's possession, the execution of this warrant

9

does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable

cause for the Court to authorize execution of the warrant at any time in the day or night.

## V.  SNAPCHAT APPLICATION INFORMATION

22.     The following information has been provided to me by the Snapchat Law

Enforcement Guide, published by Snap Inc., which was updated on September 29, 2020:

"Snapchat is a mobile application made by Snap Inc. ("Snap") and available through the iPhone

App Store and Google Play Store.  The Snapchat app provides users a way to share moments with

photos, videos, and chats."

23.     The Law Enforcement Guide defines Snapchat features as follows:

a.     Snaps:  Snaps are photos or videos taken using the Snapchat app's camera on an

individual's mobile device, and may be shared directly with the user's friends, or in a

Story (explained below) or Chat.  Snap's servers are designed to automatically delete a

Snap after it has been opened by all intended recipients.  Snap's servers are designed to

automatically delete an unopened Snap sent directly to a recipient after 30 days and an

unopened Snap in Group Chat after 24 hours.

b.     Stories:  A user can add Snaps to their "Story".  A Story is a collection of Snaps

displayed in chronological order.  Users can manage their privacy settings so that their

Story can be viewed by all Snapchatters, their friends, or a custom audience.  A user can

also submit their Snaps to Snapchat's crowd-sourced service "Our Story", which enables

their Snaps to be viewed by all Snapchatters in Search and Snap Map.  Snap's servers

are designed to automatically delete a Snap in a user's Story 24 hours after the user posts

the Snap, but the user may delete part or all of the Story earlier.  Submissions to Our

Story may be saved for longer periods of time.

c.    Memories:  Memories is Snapchat's cloud-storage service.  Users can save their sent or unsent Snaps, posted Stories, and photos and videos from their phone's photo gallery in Memories.  Content saved in Memories is backed up by Snap and may remain in Memories until deleted by the user.  Users may encrypt their content in Memories (called "My Eyes Only"), in which case the content is not accessible to Snap and cannot be decrypted by Snap.

d.    Chat: A user can type messages, send Snaps, audio notes, and video notes to friends within the Snapchat app using the Chat feature.  Snap's servers are designed to automatically delete one-to-one chats once the recipient has opened the message and both the sender and recipient have left the chat screen, depending on the user's chat settings.  Snap's servers are designed to automatically delete unopened one-to-one chats in 30 days.  Users can also chat in groups.  Chats sent in groups are deleted after 24 hours whether they are opened or not.  A user can save a message in Chat by pressing and holding the message.  The user can unsave the message by pressing and holding it again. This will delete it from Snapchat's servers.  Users can also delete chats that they have sent to a recipient before the recipient has opened the chat or after the recipient has saved the chat.

e.    Location Data: If a user has device-level location services turned on and has opted into location services on Snapchat, Snap will collect location data at various points during the user's use of Snapchat, and retention periods for location data vary depending on the purpose of the collection.  Users have some control over the deletion of their location data in the app settings.

11

**VI. CONCLUSION**

24.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Target Cellular Device** described in Attachment A to seek the items described in Attachment B.